PER CURIAM.
This disciplinary proceeding is before us on Complaint of The Florida Bar, Report of the Referee, Petition for Review by Respondent Paul M. Pahules, and Cross-Petition for Review by The Florida Bar.
Respondent, Pahules, petitions this Court to review the penalty recommended by the Referee and submits that in light of the facts and evidence such penalty is unduly harsh. By Cross-Petition, The Florida Bar suggest that the penalty is not severe enough and should be increased from three months to one year.
Pahules was charged by Complaint of The Florida Bar with violations of DR 5-101(A), DR 5-104(A), DR S-10S(B), in that in the transactions in question there was an irreconcilable conflict in interest between Pahules and Cy Georges, Dr. Kliott, and LCP (a private corporation) on the one hand and Color flame (a public cor *24 poration) on the other hand, violation of Integration Rule 11.02(4) — money and other property entrusted to an attorney for a specific purpose is held in trust and must be applied to that purpose, violation of DR 9-102(B)(3) and 9-102(B)(4), DR 1-102(A)(1), 1-102(A)(6), DR 6-101, and Integration Rule 11.02(3)(a). The Referee found that he was guilty of violating DR 5-101 (A), 5-104(A) and 5-105(B) and Integration Rule 11.02(4), but absolved Respondent of guilt on the other counts.
The findings of the Referee relative to the activities of Respondent which have been called into question by these proceedings are as follows:
“Previous to May of 1971, the Respondent had represented a young promoter by the name of Cy Georges in several real estate ventures. Some time prior to that, an inventor by the name of Dr. Leon Kliott had come to the Respondent with seventeen scientific creations he claimed to be original and which he desired to patent. The Respondent has had considerable experience in patent law both in government and in private practice since his admission to the Bar in 1951.
“The Respondent obtained for Dr. Kliott a United States patent on a process that has been referred to in these proceedings as ‘colorflame’. After obtaining the patent, the Respondent then took the lead in devising a plan to exploit the patent commercially. Pursuant to this plan, the Respondent brought Dr. Kliott and Cy Georges together; the Respondent then formed a corporation called LCP Scientific (hereinafter ‘LCP’), the stock of which was owned one-third by Respondent, one-third by Cy Georges and one-third by Dr. Kliott, and caused the patent to be assigned by Dr. Kliott to LCP. The Respondent, then, formed another corporation called Color-flame of Hollywood, Inc. (hereinafter ‘Colorflame’) with authorized capital stock of 200,000 shares, with the intent that 51% of the stock of Colorflame would be issued to LCP, and the balance to the public. Respondent served as Secretary-Treasurer and general counsel of Colorflame.
“In a document dated May 29, 1971, LCP licensed the colorflame patent to Colorflame in return for a royalty of two percent (2%) of gross receipts. Then, in a document described as an ‘addendum’ to the May 29, 1971 agreement, dated May 31, 1971, Colorflame — without receipt of any additional consideration— sweetened the yield to LCP for the col-orflame patent license by providing in addition to the 2% royalty a fee of $50,000 per annum, beginning six months after colorflame goes on the market' and sales exceed $100,000, with a deadline date of June 30, 1973. And, significantly, LCP — under this Addendum — gets an option to terminate the license agreement if marketing does not start before June 30, 1973.
“The only notable asset Colorflame ever had was this patent license, and all promotion of the corporation revolved around this license. Marketing of the colorflame produce was never started.
“Respondent prepared the document dated May 29 and the document dated May 31, 1971.
“On June 3, 1971, the Respondent went to the Little River Bank and Trust Company with the corporate kit of Col-orflame. There, Cy Georges and his brother, Art Georgialis, were in the process of selling 50,000 shares of Color-flame to Dr. Duard Lawrence and those in the transaction with him for $1.00 per share. Respondent was represented to Dr. Lawrence as the general counsel and Secretary-Treasurer of Colorflame, and presented the corporate kit to Dr. Lawrence at his request for inspection.
“Although the corporate kit contained the patent license agreement dated May 29, 1971 and, perhaps, contained the Ad *25 dendum dated May 31, 1971, Dr. Lawrence missed the Addendum in the kit.
“Neither Cy Georges, Art Georgialis nor the Respondent disclosed to Dr. Lawrence the existence of the Addendum, the material changes in the May 29, 1971 agreement included in the Addendum, nor the fact that Colorflame had granted to LCP the additional and material concessions in the Addendum dated May 31 without consideration. As enthused as Dr. Lawrence was about the Colorflame process, he would not have invested in Colorflame if he had known the above facts. Neither was the material fact disclosed to Dr. Lawrence the [sic] LCP (i. e., Respondent, Kliott and Georges) had already obtained 51% of the stock and control of Colorflame without monetary consideration by the time Dr. Lawrence was solicited to purchase at $1.00 per share.
“Dr. Lawrence with his associates before the end came for Colorflame bought 85,000 shares at $1.00 per share, for a total of $85,000. In all, the public put in excess of $300,000 into Colorflame before the story ended. Each of these public shareholders paid money to the Respondent in escrow for the shares, and the Respondent, as Secretary-Treasurer of the corporation, in turn, issued each member of the public his shares. The Respondent, however, did not always pay the escrow funds into Colorflame. Whenever so requested by Cy Georges, he turned escrow funds over to Cy Georges personally, who sometimes used the funds personally and sometimes placed the funds into Colorflame. Respondent, by examining the back of the checks appropriated by Cy Georges to his own personal use, could have determined that Cy Georges was misappropriating these funds, but he did not, and continued to turn the funds over to Cy Georges personally after he knew, or should have known, that Cy Georges was misappropriating some of them.
“At the time Respondent was turning these escrow funds belonging to Color-flame over to Cy Georges personally, Cy Georges personally was indebted to the Respondent. And on one occasion, Cy Georges took $7,000 out of Colorflame, purchased a cashier’s check payable to Respondent, gave it to Respondent, and Respondent cashed it and used it for his own purposes. At the hearing, Respondent testified that Cy Georges remitted these funds to Respondent in payment of a personal liability for fees; earlier, however, at the Committee Hearing, Respondent had testified that these funds represented payment of a Colorflame obligation to him. Colorflame is now bankrupt.
“Since the colorflame process has never been marketed, LCP — whenever it wishes — may, under the Addendum dated May 31, 1971, get the colorflame patent back for nothing, and the colorflame patent was the raison d’etre of Colorflame from the start.
“The Respondent also documented for Cy Georges a sham transaction pursuant to which Colorflame appeared on paper to have acquired at a purchase price of $175,000 from another corporation dominated by Cy Georges (Gregory Pahules, the brother of Respondent, also shows on the records of that corporation as an in-corporator) a motel called The Planet. No money passed in this transaction; and no papers were filed in the public records. The only attorney involved in the ‘transaction’ was the Respondent. The Respondent billed Colorflame $1,750 (1% of the purchase price that was never paid) for his services on this ‘transaction.’ The purpose of the ‘transaction’ according to the testimony, was to make it appear on the Colorflame balance sheet that Colorflame possessed a real estate asset when, in fact, it did not. Colorflame never paid the statement of Respondent in the amount of $1,750 for legal services rendered in connection with his transaction.
*26 “In June of 1972, Dr. Duard Lawrence and others removed Cy Georges, Kliott and Respondent and took control of Col-orflame. Dr. Lawrence and his group from that moment assumed a position of belligerent hostility to Georges, Respondent and Kliott, at first threatening and then instituting litigation against Georges and the Respondent. Although Respondent failed or was slow to comply with the requests by Colorflame made by and through the new control group for records, and other properties of Color-flame in Respondent’s possession by reason of the positions of Secretary-Treasurer and general counsel from which he had been deposed, Colorflame by that time had ceased any fiduciary reliance on the Respondent and, in fact, had assumed an aggressive hostility towards him.”
The Referee found that Respondent’s conduct did not involve dishonesty, fraud, deceit or misrepresentation and recommends that Respondent be suspended for a period of three months.
Having heard argument, and having carefully reviewed the briefs and record, we approve the findings and recommendations of the Referee.
Accordingly, Respondent is hereby suspended from the practice of law for a period of three months from the effective date of this order. Execution is hereby directed to issue against Respondent for costs in the amount of $1,704.08.
It is so ordered.
OVERTON, C. J., and ROBERTS, ENGLAND and HATCHETT, JJ., concur.
ADKINS, J., concurs specially with an opinion, with which BOYD, J., concurs.